UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| LEILANIE ANN SHARROW,<br><br>    Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No. 14-cv-10659<br>Honorable Laurie J. Michelson<br>Magistrate Judge Michael Hluchaniuk |

**OPINION AND ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT [16] AND GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT [14]**

Leilanie Sharrow appeals the Commissioner of Social Security's denial of her claim for disability insurance and period of disability benefits. She argues that her mental health impairments, which include bipolar disorder, depression, and anxiety, prevent her from working. The Court finds that the Administrative Law Judge ("ALJ") who evaluated Sharrow's claim improperly rejected the opinion of Sharrow's treating psychiatrist in favor of an opinion by a state agency psychologist who had not reviewed all of Sharrow's records. Therefore, Plaintiff's Motion for Summary Judgment (Dkt. 14) is **GRANTED**, Defendant's Motion for Summary Judgment (Dkt. 16) is **DENIED**, and the findings of the Commissioner are **REMANDED** for reconsideration in light of this opinion.

**I. BACKGROUND**

Sharrow is currently 46 years old, and was 40 when she alleges she became unable to work. (*See* Tr. 136.) She has worked as a bartender, car salesperson, store manager, waitress and salesperson. (*See* Tr. 57–58, 214–21.) She has a GED and has attended some college. (Tr. 33, 388.)

**A. Procedural History**

Sharrow filed her claim for disability insurance and period of disability benefits on February 22, 2011, alleging she became unable to work beginning October 22, 2010. (Tr. 136.)[1] Her claims were initially denied by the Commissioner on May 18, 2011. (Tr. 81, 82.) Sharrow requested a hearing and on May 5, 2012, she appeared with counsel before Administrative Law Judge ("ALJ") Kathleen Eiler, who considered the case de novo. (Tr. 28–62). In a decision dated June 15, 2012, the ALJ found that Sharrow was not disabled. (Tr. 11–23.) Plaintiff requested a review of this decision, and the ALJ's decision became the final decision of the Commissioner when the Appeals Council, on December 27, 2013, denied Sharrow's request for review. (Tr. 1.) *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543–44 (6th Cir. 2004). On February 12, 2014, plaintiff filed a complaint in this Court, seeking judicial review of the Commissioner's unfavorable decision disallowing benefits. (Dkt. 1).

**B. Testimony at the Administrative Hearing**

At the administrative hearing before ALJ Eiler, Sharrow's attorney questioned her about her anxiety, depression, bipolar disorder, attention deficit disorder ("ADD"), post-traumatic stress disorder ("PTSD"), irritable bowel syndrome ("IBS"), alcohol abuse, and borderline personality disorder. (Tr. 35–49.) Sharrow said she has to take "two anxiety pills normally every morning just so [she] can deal with work" (as a server at IHOP) because she has "a lot of anxiety and a lot of stress at work." (Tr. 35) She testified that the anxiety is because she has a hard time dealing with people. (*Id.*) She said she does not talk to her coworkers, and they ask her why she does not smile and why she always looks angry. (Tr. 35–36.)

---

[1] The transcript of administrative proceedings filed by the Commissioner (Dkt. 11) is cited as "Tr."

2

Regarding her depression, Sharrow testified that she feels worthless and she thinks about suicide every day, but does not do it because of her children. (Tr. 42–43.) Her depression also affected her appetite, said Sharrow, and she told the ALJ she had recently lost thirty pounds because of her depression. (Tr. 43.) Her doctors have increased her medication several times. (*Id.*) Her bipolar disorder, which she said was separate from her depression, caused her to have about 28 days of low moods out of 30, and two days of high moods. (Tr. 46.) She said it affected her motivation, so that she might go two to three days without showering and a week without cleaning her house, and she did not want to go anywhere or do anything; she just wants to sit in her house. (Tr. 46–47.) But she said she forces herself to leave the house to go grocery shopping, take her kids to their functions, and go outside to watch her granddaughter play. (Tr. 47.)

Regarding her ADD, Sharrow testified that she generally does not "comprehend things well," and has to "constantly have things repeated." (Tr. 38–39.) She told the ALJ that she had this difficulty for "a very long time," and "can't read books." (Tr. 39.) She also said she "can't stay on task for a long period of time," "can't stay focused [on] one thing at a time," and gets easily distracted. (Tr. 40.) For example, she said: "like I'm trying to clean, say the bathroom or something, I stop cleaning the bathroom and I jump to another thing." (*Id.*)

Sharrow testified that she has been diagnosed with post-traumatic stress disorder ("PTSD") because of molestation between ages five to ten, a rape at thirteen, and rape by her ex-husband. (Tr. 40.) She said it affected her sleep, sometimes waking her up as many as ten times a night, which caused fatigue during the day. (Tr. 41.)

Regarding her irritable bowel syndrome ("IBS"), Sharrow testified that she has severe constipation that alternates with diarrhea and cramping, to the extent that she cannot get out of bed and wakes up vomiting, for three or four days at a time. (Tr. 43–44.) She has these flareups

3

once or twice a month. (Tr. 44.) The constipation is also painful, to the point that she can barely walk. (*Id.*) And, said Sharrow, the medication she takes, Miralax, does not always work. (*Id.*)

Regarding her alcohol abuse, Sharrow testified that she had been sober for 20 months, that she receives Vivitrol injections, and that she attends Alcoholics Anonymous meetings once or twice a week. (Tr. 45.)

Regarding her borderline personality disorder, Sharrow testified that it was "one of the reasons I feel worthless, because I'm not doing something right. I always feel like I'm not doing something right." (Tr. 46.) And she said her "mind races all the time," so that she needed to take a sleeping pill to sleep at night. (*Id.*)

When asked about her medications, Sharrow testified that she takes Macrobid to prevent severe urinary tract infections, Topamax (which causes her hands to shake) to prevent migraines, Klonopin (which causes drowsiness) for anxiety, and Lamictal and Restoril. (Tr. 47–48.)

Sharrow's attorney and the ALJ also asked about Sharrow's work history and activities. She testified that she currently works as a server at an IHOP an average of 15 to 16 hours per week but she could work more "if [she] can handle it." (Tr. 34.) She typically works an eight-hour shift. (Tr. 42.) She testified that she calls in sick due to anxiety or depression about once a week or three to four times per month. (Tr. 35.) And she has had to leave work early because she "just can't deal with it or [is] having a hard time." (Tr. 36.) She has also called in sick because she is "cramping up, having diarrhea, throwing up," as a result of her IBS.

Sharrow testified that she was let go after three months at a previous waitressing job because they said she was "disruptive with customers" and "was not happy enough" when dealing with them. (Tr. 36–37.) She quit another waitressing job, at which she had worked for a long time and from which she had taken two medical leaves, because she "had just quit

4

drinking . . . and the stress level was getting to me." (Tr. 37.) She was let go from a job at Subway because she "couldn't handle the stress and one day [she] just walked out." (Tr. 37–38.) At another waitressing job, she missed a shift when they changed her hours without telling her, so she got mad and quit. (Tr. 39.) Another restaurant let her go because she "couldn't handle the shorthand of how they wanted you to turn the checks in" and "couldn't comprehend the things fast enough like they wanted [her] to." (Tr. 38–39.) She said her difficulty with comprehension has also caused her to miss out on the chance to be a lead server. (Tr. 39.)

In April of 2010, Sharrow completed a two-week certified nurse assistant ("CNA") training, but she said she has avoided getting certified because she was afraid to take the written test, and she has not been able to find a job as a nurse assistant without the state certification. (Tr. 52.)

Sharrow testified that she drives herself to work but she has trouble concentrating and has "a real bad habit of falling asleep at the wheel." (Tr. 54.) She denied having any hobbies. (Tr. 54–55.) She had custody of her six-year-old granddaughter and shared custody of her 15-year-old autistic son, and her 19-year-old son also lived with her. (Tr. 33–34.) She testified that she gets the granddaughter up and dresses her for kindergarten in the morning, then a bus takes her to school and daycare. (Tr. 50–51.) Sharrow also cared for her daughter's two children for four months in 2010 (a baby and a one-year-old) and two weeks in 2012 (a two-year-old and a three-year-old). (Tr. 51.) She said they were "big stressors," but she felt she did not have a choice because she did not want them to go to child protective services. (*Id.*) The first time, in 2010, she was still married and her husband did most of the work. (*Id.*)

5

After Sharrow testified, the ALJ questioned a vocational expert ("VE") about job availability for a hypothetical individual with the same age, education and work experience as Sharrow, who had no exertional limitations but the following nonexertional limitations:

> She can perform simple, routine, repetitive tasks in a low stress environment, and by that I mean no more than occasional changes in a routine work setting and no production rate pace work. She can occasionally interact with supervisors and coworkers, but should never interact with the general public. She would work best i[n] relative isolation or in a small familiar group.

(Tr. 59.) The VE testified that such an individual could not perform any of Sharrow's past work. (*Id.*) But he said such an individual could perform work as a custodian or dishwasher in the medium exertional category and as a custodian in the light exertional category. (*Id.*) When the ALJ added that the hypothetical individual would miss at least three days of work per month, the VE said that would rule out all full-time competitive work. (*Id.*) The VE also testified that a hypothetical individual who was off task more than ten percent of the time would not be able to maintain full-time competitive work. (Tr. 61.)

When Sharrow's counsel asked about an individual "who could not usefully perform or sustain the activity of getting along with coworkers or peers without distracting them or exhibiting behavioral extremes," the VE testified that the dishwasher and custodian jobs could still be performed. (Tr. 60.) He also testified that the dishwasher and custodian jobs could be performed by an individual with marked limitation in responding appropriately to changes in the work setting. (Tr. 60–61.)

### C. Medical Source Opinions and Records

Michigan Rehabilitation Services referred Sharrow to Thomas L. Seibert, M.S., a Limited License Psychologist, for a learning disability evaluation and clinical psychological study. (Tr. 384, 407.) He evaluated her on January 12, 2011, and February 9, 2011. (*See* Tr. 384–408.)

6

Seibert's diagnostic impression was bipolar disorder, PTSD, generalized anxiety disorder, borderline personality disorder, and alcohol dependence (in early full remission). (Tr. 390, 402, 404.) Based on her performance on the Wechsler Adult Intelligence Scale-IV, Seibert concluded that Sharrow was "functioning in the borderline to average range of intellectual ability," with "borderline thinking speed" and her full-scale IQ of 82 was "in the borderline category." (Tr. 391–2, 396.) But he said "[a]ll of her academic skills are well within the average range," and "she does not create a diagnostic impression of borderline intellectual functioning." (Tr. 405.) He also concluded that "[s]he has no deficits in her adaptive behavior associated with her borderline full-scale IQ score." He noted her report that "she earned above-average grades in over two years of college study." (*Id.*) On a Specific Learning Disabilities Behavior Checklist, Seibert said, "Sharrow indicated that she does not currently have any severe symptoms of an attention deficit hyperactivity disorder." (Tr. 402–3; *see also* Tr. 386.) He concluded, "[i]t is the impression of this examiner that Ms. Sharrow's poor concentration is a result of her psychiatric challenges and not an attention deficit hyperactivity disorder." (Tr. 405; *see also* Tr. 403.)

On May 19, 2011, Judy Strait, Psy. D., L.P., reviewed Sharrow's self-reports of functioning, her work history, and her mental health treatment records for Michigan Disability Determination Services, a state agency that processes claims for the Commissioner. (Tr. 73–4, 76.) She determined that Sharrow had mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. 75–6.) She therefore concluded that Sharrow did not meet the criteria in the Listings for affective disorders and personality disorders, and a residual functional capacity ("RFC") assessment would be needed to determine whether Sharrow was disabled. (*Id.*) In the RFC assessment, Strait indicated

7

that Sharrow had moderate limitations in her ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to respond appropriately to changes in the work setting. (Tr. 76–8.) She explained:

> The claimant's cognition and concentration are impaired. She will have difficulty with complex tasks and demanding work environments. Her social functioning is reduced and she may not work well with the general public. She will work best alone or in a small, familiar group. Adaptation will vary. The claimant retains the capacity to perform routine, 2-step tasks on a sustained basis.

(Tr. 78.)

In May 2012, Dr. Mukesh Lathia and Kathy Coleman of Michigan Psychiatric and Behavioral Associates, P.C., ("MPBA") jointly completed a Mental Impairment Questionnaire and Mental Residual Functional Capacity Assessment on forms provided by Sharrow's attorney. (Tr. 506–08.) They provided a diagnosis of bipolar disorder, alcohol dependence in full sustained remission, and borderline personality disorder. (*Id.*) They identified Sharrow's current Global Assessment of Functioning ("GAF")[2] as 45 and her highest GAF in the past year as 50. (*Id.*)

On a list of "patient's signs and symptoms," Dr. Lathia and Coleman checked boxes for appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability,

---

[2] A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"),* 30–34 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32. A GAF score of 41 to 50 reflects "[s]erious symptoms (e.g. suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *DSM–IV* at 34.

recurrent panic attacks, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, blunt, flat or inappropriate affect, decreased energy, and generalized persistent anxiety. (*Id.*)

Dr. Lathia and Coleman indicated that plaintiff was markedly limited, meaning she cannot usefully perform or sustain the activity, in nine areas: ability to maintain attention and concentration for extended periods; ability to sustain an ordinary routine without supervision; ability to work in coordination with or proximity to others without being distracted by them; ability to complete a normal work day or work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number or length of rest periods; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; ability to respond appropriately to changes in the work setting; ability to travel in unfamiliar places or use public transportation; and ability to set realistic goals or make plans independently of others. (Tr. 507–08.) In the "remarks" section, they wrote: "This patient has very severe Bipolar Disorder, which affects every aspect of her life." (Tr. 508.) They also noted "[r]ecent noticeable weight loss." (*Id.*)

The administrative record before the ALJ included a large volume of records of Sharrow's treatment at MPBA. (*See* Tr. 299–383, 414–505, 509–24.) They cover the period from July 2010 to May 2012. During that time, Sharrow saw Dr. Lathia on approximately a monthly basis for medication review. (*See* Tr. 314–21, 327–8, 354–6, 361, 364, 366, 368, 382–3, 422–3, 426–7, 434–5, 444–7, 456–7, 460–1, 475, 509–10, 523–4.) She saw Coleman every two weeks, on average, for case management that sometimes included home visits. (*See* Tr. 301–10, 324, 330, 333, 348, 376, 381, 476–99, 515, 522.) She also saw a licensed master social worker,

9

William Beard, at MPBA for therapy about every two weeks. (*See* Tr. 299–03, 311–13, 323, 325, 329, 335, 337, 350, 377–8, 414–15, 418–21, 458, 473, 424–5, 432–3, 440–3, 452–5, 463–72, 500.) And during May 2011, she attended a weekly group therapy session at MPBA. (*See* Tr. 332, 334, 336, 345.) Many of these treatment records include detailed observations and notes from the sessions. For example, in February 2012, Dr. Lathia wrote: "seen on an emergency basis. Pt says trazodone started when she saw Brenda [Ruppal, RN] last makes her too sleepy and anxious, depressed." (Tr. 426.) Coleman also wrote longer "Case Management/Therapy Assessment Updates" in November 2010, May 2011, and April 2012. (Tr. 340–3, 369–73, 517–20.) The first two updates report Sharrow's diagnosis as bipolar disorder, most recent episode depressed; alcohol abuse, in partial remission; and borderline personality disorder; with a GAF of 50. (Tr. 342–3, 372.) In the April 2012 update her diagnosis is bipolar disorder, most recent episode mixed; alcohol dependence, in full sustained remission; and borderline personality disorder; with a GAF of 45. (Tr. 519–20.) The narrative portion of the update includes the statements: "[s]he has worked at least seven different places since beginning with case management in November, 2010," "Loni is struggling with increased anxiety and depression," and "Loni reports increased suicidal ideations, however, denies a plan." (Tr. 517, 519.)

The administrative record also includes treatment notes from Sharrow's family doctor. (*See* Tr. 284–95, 409–13.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

10

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

ALJ Eiler first found that Sharrow was insured through December 31, 2015. (Tr. 11.) The ALJ then turned to the five-step sequential evaluation of Sharrow's allegation of disability. ALJ

Eiler found at step one that Sharrow engaged in substantial gainful activity during the relevant period by working part-time as a waitress in 2010 and 2011 and that the jobs did not qualify as an unsuccessful work attempts. (Tr. 13–14.) But the ALJ gave Sharrow "the benefit of the doubt in finding that she is unlikely to engage in substantial gainful activity for a 12-month period beginning in January 2012," and therefore continued with the analysis. (Tr. 14.) At step two, ALJ Eiler found that plaintiff had the following severe impairments: bipolar disorder, history of attention deficit hyperactivity disorder, post-traumatic stress disorder, and personality disorder. (Tr. 14–15.) The ALJ found Plaintiff's irritable bowel syndrome, migraine headaches, and history of alcohol abuse were not severe. (*Id*.) At step three, ALJ Eiler found that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (Tr. 15–17.)

Between steps three and four, ALJ Eiler determined that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels with the following nonexertional limitations:

> She can perform simple, routine, repetitive tasks in a low-stress environment, meaning no more than occasional changes in routine work setting, and no production-rate pace work. She could occasionally interact with co-workers and supervisors, but should never interact with the public. She would work best in relative isolation or in a small familiar group.

(Tr. 17–21.) At step four, ALJ Eiler found based on vocational expert testimony that plaintiff could not perform her past relevant work as a bartender, car salesperson, store manager, waitress, and retail salesperson. (Tr. 21.) At step five, ALJ Eiler relied on vocational expert testimony to find that considering Plaintiff's age, education, experience, and RFC, there were jobs she could perform that exist in sufficient numbers, such as custodian (38,000 jobs in Michigan at medium exertional level, 13,000 at light exertional level) and dishwasher (8,000 jobs in Michigan). (Tr.

12

22–23.) The ALJ therefore concluded that Sharrow had not been under a disability from the alleged onset date, October 22, 2009, through the date of the decision, June 15, 2012. (Tr. 23.)

## II. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512–13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of

whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## III. ANALYSIS

Sharrow argues that the ALJ erred by (1) failing to give controlling weight to an opinion of a treating medical source; (2) failing to give good reasons for not assigning controlling weight to that opinion; and (3) basing the RFC on the opinion of a non-examining medical source that predated more than 100 pages of treatment records. The Court agrees that the ALJ's treatment of the medical source opinions is not supported by substantial evidence, and therefore remands for the Commissioner to address these errors.

### A. Treating Source Opinions

The opinion of a treating physician must be given controlling weight if it is well-supported and not inconsistent with the record. *See* 20 C.F.R. § 416.927(c)(2); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544. Even if it is not given controlling weight, the opinion of a treating physician is subject to a rebuttable presumption of deference. *See* 20 C.F.R. § 416.927(c)(2); *Gayheart*, 710 F.3d at 376; *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544. To rebut the presumption, the ALJ must show that substantial evidence supports not deferring to the treating source. *See Rogers*, 486 F.3d at 246. This includes demonstrating that she considered the non-exhaustive list of factors in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c). *See Rogers*, 486 F.3d at 242

("When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors."); *see also Wilson*, 378 F.3d at 544; Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4. In fact, the requirement to provide "good reasons" for the weight assigned to a treating-source opinion is a substantial procedural right, abridgement of which warrants remand even when substantial evidence supports the ALJ's ultimate disability determination. *See Rogers*, 486 F.3d at 243; *Wilson*, 378 F.3d at 544.

The ALJ assigned "limited weight" to the Lathia/Coleman opinion primarily because she found the "treatment records do not document significant objective findings and observations to support this degree of limitation." (Tr. 21.) Specifically, the ALJ explained that (1) "Dr. Lathia has consistently described the claimant as attentive and cooperative, with no significant communication problems"; (2) "although the claimant complained of daily suicidal thoughts at the hearing, she seems to have reported these thoughts to Dr. Lathia on only two occasions, both during times of increased personal or financial stress," and "[a]t other times, Dr. Lathia's notes indicate that the claimant 'emphatically' denied any suicidal thoughts or intention, and she was able to convincingly contract for personal safety at all times"; (3) "none of the claimant's mental health professionals has reported evidence of tiredness, lack of alertness, or psychomotor retardation, which might indicate functional problems related to poor sleep," and (4) "neither Ms. Coleman nor Dr. Lathia has reported significant impairment in memory, concentration, thought process, or speech on mental status examination." (Tr. 18–19.) The ALJ also found that "although the claimant has had a variety of different employers during the relevant period, the

15

record reflects that she has remained employed consistently, as well as caring for several children and keeping appointments for case management, therapy, and medication review." (*Id.*) She therefore concluded that the Lathia/Coleman opinion "is inconsistent with substantial evidence in the case record." (*Id.*)

These are not good reasons supported by substantial evidence. First, the Court notes that "the length, frequency, nature, and extent of the treatment relationship" and "the specialization of the physician" factors weigh heavily in favor of the Lathia/Coleman opinion, and the ALJ did not expressly address them when she explained his reasons for assigning limited weight to this opinion. Dr. Lathia is a psychiatrist and thus specializes in the mental health impairments at issue in the opinion. And he supervised Sharrow's treatment at MPBA, which comprised more than weekly contact with Sharrow over the course of almost two years and included case management, therapy, and medication management. (*See* Tr. 299–383, 414–505, 509–24.) Coleman, though not an acceptable medical source, 20 C.F.R. § 404.1513(a), also had extensive contact with Sharrow that included home visits.

Second, the Court finds that the ALJ has not shown that the MPBA treatment records and the record as a whole are inconsistent with the Lathia/Coleman opinion. The ALJ's discussion of these records is selective and incomplete. For example, the ALJ notes that Sharrow often denied suicidal ideation without also acknowledging that the records indicate Sharrow attempted suicide in 1993, 1996, and 2010. (*See* Tr. 342, 371, 389, 519.) The ALJ says there is no report of "functional problems related to poor sleep" without acknowledging that there are many references to sleep issues. (*See, e.g.*, Tr. 300, 382, 442, 444.) She says Sharrow is described as "attentive and cooperative, with no significant communication problems" without acknowledging that Sharrow is often described as having a restricted, flat, detached, or labile

16

affect (*see, e.g.*, 312, 313, 316, 321, 414, 418, 420, 424, 452, 466, 475, 477, 482, 500, 515, 518, 522), and that her insight is often described as limited (*see* Tr. 316, 317, 321, 447, 475, 510).

The ALJ's statement that "neither Ms. Coleman nor Dr. Lathia has reported significant impairment in memory, concentration, thought process, or speech on mental status examination," has some merit: there is less evidence in the MPBA records of impaired cognitive functioning than one might expect given Dr. Lathia's opinion that Sharrow had marked impairments in concentration and other cognitive functions. (*But see* 319, 342, 519.) But the Court finds it significant that Seibert concluded that "Sharrow's poor concentration is a result of her psychiatric challenges and not an attention deficit hyperactivity disorder." (Tr. 405; *see also* 403.) In this light, it is not surprising that Dr. Lathia and his staff did not record concentration issues in their notes for treatment of her mental health issues and yet opined that she had marked impairments in her cognitive functioning. In fact, the Lathia/Coleman opinion specifically attributed her impairments to her "very severe Bipolar Disorder, which affects every aspect of her life." (Tr. 508.) And on this point, the treatment records are entirely consistent. The bipolar diagnosis is consistent throughout the records, and the records regularly indicate that Sharrow continued to experience significant levels of anxiety and depression. (*See, e.g.*, 314, 315, 321, 341, 371, 424, 426, 444, 452, 460, 477, 482, 515, 519.)

Overall, the MPBA treatment records paint a picture of a woman with severe emotional issues who requires close monitoring and coaching to cope with her everyday life. The ALJ has not adequately explained how the Lathia/Coleman opinion is unsupported or inconsistent with these records. Nor, contrary to the ALJ's reasoning, is the treating-source opinion undermined by inconsistency with Sharrow's ability to work, care for children, and keep appointments. The treatment notes establish that Dr. Lathia and his staff were well aware of Sharrow's work and

family situation, and that Sharrow's ability to handle her work and family was not unimpaired. For example, Coleman's April 2012 update mentions that Sharrow "has worked at least seven different places since beginning with case management in November, 2010." (Tr. 517.) And Sharrow's MPBA therapist wrote in March 2012: "Lonnie overwhelmed. She has had [her daughter] Sarah's two children, who are out of control. Sarah continues to threaten to cut her off from seeing the children if she does not keep the children. Lonnie[] is exhausted, reports crying all weekend, not being able to eat because of anxiety." (Tr. 420; *see also* 422, 440, 496.) The notes also establish that Sharrow often did not keep her appointments. (*See* Tr. 326, 330, 348–9, 357, 362, 363, 367, 380, 479, 480, 484, 485, 487, 493, 495, 516.)

The ALJ has not rebutted the presumption of deference due the Lathia/Coleman opinion with good reasons supported by substantial evidence. The decision will be remanded for proper consideration of this opinion.

### B. Reliance on Strait's Opinion

The ALJ gave "significant weight" to the opinion of Strait, the psychologist and DDS consultant who opined on Sharrow's functional impairments based on a review of Sharrow's records in May 2011. (Tr. 20.) The ALJ specifically noted that the RFC was supported by Strait's opinion. (Tr. 21.) And the ALJ's findings regarding Sharrow's impairments and RFC closely mirrored Strait's opinion. Yet the ALJ's discussion of the weight accorded to Strait's opinion did not address the fact that the opinion was rendered in May 2011, without the benefit of the May 2012 Lathia/Coleman opinion and without reviewing the hundred-plus pages of treatment notes covering an additional year of treatment at MPBA that were part of the record before the ALJ. It also appears that Strait did not review the Seibert report. (*See* Tr. 64–65.) The Court finds the ALJ's decision to give essentially dispositive weight to Strait's opinion was not

supported by substantial evidence in the record as a whole. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (finding remand appropriate where the ALJ adopted an RFC formulated by a non-examining state agency physician who did not review several evaluations of the claimant's physical capabilities from treating and examining physicians); *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 518 (6th Cir. 2011) (finding remand appropriate where the ALJ adopted the opinion of a non-examining state agency physician who had not reviewed a key opinion by the claimant's treating physician).

### C. Substantial Gainful Activity

In her Reply brief, Sharrow challenges for the first time the ALJ's finding that she engaged in substantial gainful activity in 2010 and 2011. (Dkt. 17, Reply at 1–3; *see* Tr. 14.) Arguments raised for the first time in a reply brief are generally not properly before the court. *See Balsley v. LFP, Inc.*, 691 F.3d 747, 773 (6th Cir. 2012) (citing *United States v. Perkins*, 994 F.2d 1184, 1191 (6th Cir. 1993) ("Issues raised for the first time in a reply brief are not properly before this court.")). The Commissioner has not had an opportunity to address the argument. *See United States v. Jerkins*, 871 F.2d 598, 602 n.3 (6th Cir. 1989) (citing *Knighten v. C.I.R.*, 702 F.2d 59, 60 (5th Cir. 1983) ("It is impermissible to mention an issue for the first time in a reply brief, because the appellee then has no opportunity to respond.")). Although Sharrow tries to frame it as a response to the Commissioner's motion, the Commissioner was only summarizing the ALJ's findings. (*See* Def.'s Mot. at 7.) Sharrow could have and should have raised this issue in her own motion. She did not, and so the Court will not consider it.

## IV. CONCLUSION AND ORDER

For the reasons set forth above, Plaintiff's Motion for Summary Judgment (Dkt. 14) is **GRANTED**, Defendant's Motion for Summary Judgment (Dkt. 16) is **DENIED**, and the findings of the Commissioner are **REMANDED** for reconsideration in light of this opinion.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  March 30, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on March 30, 2015.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson